## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN CIVIL LIBERTIES UNION,
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005

   *Plaintiff*,

  v.

U.S. DEPARTMENT OF HOMELAND
SECURITY,
245 Murray Lane SW
Washington, DC 20528,

U.S. DEPARTMENT OF HOMELAND
SECURITY OFFICE OF INSPECTOR
GENERAL,
245 Murray Lane SW
Washington, DC 20528,

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,
500 Twelfth Street SW
Washington, DC 20536,

   *Defendants*.

No. _____

## **COMPLAINT**

  1.  Plaintiff American Civil Liberties Union ("ACLU") brings this action against the

United States Department of Homeland Security ("DHS"), DHS's Office of the Inspector General

("DHS OIG"), and the United States Immigration and Customs Enforcement ("ICE") under the

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Declaratory Judgment Act,

28 U.S.C. § 2201 and 2202, seeking declaratory and injunctive relief to compel compliance with

the requirements of FOIA to immediately release improperly withheld agency records.

  2.  To date, the COVID-19 pandemic, including the disease's resurgence in the form

of the Delta variant, has killed more than 704,000 people in the United States.[1]

3.      Defendants hold thousands of immigrants in detention facilities across the United States.[2]  Individuals detained in those facilities are particularly at risk of contracting and falling ill, or dying from, the coronavirus.  As a recent DHS Inspector General report found, in "congregate environments" like ICE facilities, the coronavirus "can spread easily," and some detention facilities have "not consistently manage[d] medical sick calls" or conducted adequate testing.[3]  For example, the New York Times reported that in June 2020, ICE detention facilities "had an average infection rate five times that of prisons and 20 times that of the general population."[4]  In September 2021 the New York Times reported that ICE centers "are reporting major surges in coronavirus infections among detainees" as public health officials noted that "increasingly crowded facilities can be fertile ground for outbreaks."[5]

4.       In 2020, during the peak of the first wave of the coronavirus, ICE reported its highest annual death toll in immigration detention in fifteen years.  In the few years prior to 2020, though, dozens of individuals were also reported as dying while in ICE custody.[6]

---

[1] Ctrs. for Disease Control and Prevention, COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#trends_dailydeaths (last updated Oct. 5, 2021).

[2] U.S. Immigrations & Customs Enf't, Detention Management (Detention FY 21 YTD), https://www.ice.gov/detention-management#tab2 (last updated Oct. 1, 2021).

[3] *See* Dep't of Homeland Sec., Office of Inspector General, ICE's Management of COVID-19 in Its Detention Facilities Provides Lessons Learned for Future Pandemic Responses, (Sept. 7, 2021), https://www.oig.dhs.gov/sites/default/files/assets/2021-09/OIG-21-58-Sep21.pdf.

[4] Isabelle Niu and Emily Rhyne, *4 Takeaways From Our Investigation Into ICE's Mishandling of Covid-19*, The New York Times, Apr. 25, 2021, https://www.nytimes.com/2021/04/25/video/immigration-detention-covid-takeaways.html.

[5] Maura Turcotte, *Virus cases are surging at crowded immigration detention centers in the U.S.*, The New York Times, July 6, 2021 (updated Sept. 6, 2021), https://www.nytimes.com/2021/07/06/us/covid-immigration-detention.html.

[6] Kendall Taggart et al., *More Than 40 Immigrants Have Died in ICE Custody In The Past Four Years. Here Are Thousands Of Records About What Happened*, BuzzFeed News, Oct. 29, 2020, https://www.buzzfeednews.com/article/kendalltaggart/here-are-thousands-of-documents-about-immigrants-who-died.

5.      The number of total deaths of detainees is likely much higher than reported by ICE. For years, media reports have noted that on multiple occasions ICE has released individuals from custody on their death beds. The deaths of these individuals are not reported by ICE.[7]  This practice is consistent with reports finding that ICE has a "culture of secrecy" that contributes to a failure to report and disclose deaths and detention conditions leading to those deaths.[8]

6.      ICE's practice is widespread and not limited to particular detention facilities.  Four cases of ICE's practice of releasing detainees on their death beds, spanning from facilities in Alabama to California, show the serious nature of the problem:

> a.  Martin Vargas Arellano, a 55-year-old with diabetes, hypertension, gout, and hepatitis C, was detained at an ICE facility in Adelanto, California in 2020.  He repeatedly asked to be released from detention because his health conditions placed him at serious risk of life-threatening illness or death should he contract Covid-19. Mr. Arellano, however, contracted Covid-19 in March 2021, suffered a stroke in ICE detention, and was admitted to a local hospital, where he remained in ICE custody.  ICE formally released Mr. Arellano from its custody three days before his death at the hospital.   ICE did not inform his family or attorney of his hospitalization or death.[9]  His attorney pieced together that he had passed away ten

---

[7] *E.g.*, Dan Glaun, *How ICE Data Undercounts COVID-19 Victims*, Frontline, Aug. 11, 2020, https://www.pbs.org/wgbh/frontline/article/how-ice-data-undercounts-covid-19-victims/ ("This has been a problem, with ICE hospitalizing people, releasing them, and then they die"); Amy Taxin and Krista Larson, *Questions arise after US frees asylum-seeker on life support*, AP News, Nov. 30, 2017, https://apnews.com/article/immigration-health-brazil-united-states-africa-7c272f12e314453f86c20a6ec69c88fd ("It isn't the first time immigrant advocates have raised concerns about the release of ill detainees.").

[8] Nina Bernstein, *Officials Hid Truth of Immigrant Deaths in Jail*, The New York Times, Jan. 9, 2010, https://www.nytimes.com/2010/01/10/us/10detain.html (describing evidence obtained through FOIA requests showing officials "used their role as overseers to cover up evidence of mistreatment, deflect scrutiny," and "prepare exculpatory public statements after gathering facts that pointed to substandard care or abuse").

[9] *See* Joe Nelson, *Detainee who pleaded for release from ICE immigration center in Adelanto dies from COVID-19*, The Sun, Mar. 22, 2021, https://www.sbsun.com/2021/03/22/detainee-who-pleaded-for-release-from-ice-immigration-center-in-adelanto-dies-from-covid-19/; Summer Lin, *Man who begged for ICE release dies of COVID*

days after the fact by filing a missing person's report and calling the coroner's office.[10]  According to a federal district court judge overseeing a class-action in which Mr. Arellano was a party, the Government's statement that Mr. Arellano had been released from detention appeared to "actively conceal" from the court, his attorneys, and his family his progressive illness and death and raised "significant concerns regarding the Government's actions and lack of candor."[11]

b.  Jose Ibarra Bucio, a 27-year-old, was also detained in Adelanto, California.  In 2019, he suffered a brain hemorrhage while detained and fell into a coma.  He was transferred to a local hospital and was formally released from ICE's custody two weeks later.  He died four weeks after his release from custody, when his family decided to take him off life support.[12]

c.  Johana Medina Leon was a 25-year-old transgender asylum seeker held at an immigration detention facility in Otero County, New Mexico in 2019.  While in custody she complained of health issues for over a month and tested positive for HIV.  She was routinely denied medical care, including the provision of basic equipment such as an IV-drip so she could treat herself using her nursing skills.  After seven weeks in custody, she complained of chest pains and was taken to the

---

*days after he's freed, lawyers say*, The Sacramento Bee, Mar. 23, 2021, https://www.sacbee.com/news/nation-world/national/article250148244.html.

[10] Nelson, *Detainee who pleaded for release from ICE immigration center in Adelanto dies from COVID-19*, *supra* note 9.

[11] Order, *Roman v. Wolf*, ED CV 20-00768 TJH, Dkt. 1031, (C.D. Cal. Mar. 20, 2021).  In that case, the federal district court earlier held that ICE violated detainees' constitutional rights at the Adelanto facility based on "detailed factual findings" of the facility and staff taking inadequate precautions to protect detainees from the coronavirus. *Roman v. Wolf*, No. 20-55436, 2020 WL 5683233, at *4 (9th Cir. Sept. 23, 2020).

[12] Amy Taxin, *Family seeks answers in immigrant's death after detention*, AP News, Apr. 10, 2019, https://apnews.com/article/immigration-us-news-ap-top-news-caribbean-california-8775303f79ee4d44a5959c34a8f3d99d.

hospital, where ICE released her from custody.  She died four days later of pneumonia.[13]

    d.   Teka Gulema was an Ethiopian man detained at an ICE facility in Gadsden, Alabama between 2012 and 2015.  While in custody, he was paralyzed following a bacterial infection and transferred to a hospital, where he remained under ICE custody for a year.  But when he fell into a coma in the hospital, he was released from custody, and died weeks later.[14]

7.    ICE's underreporting of detainees who would have died under ICE's custody but-for their twelfth-hour release has dire consequences.  ICE is required to report all in-custody deaths to the public and release investigatory reports of all in-custody detainee deaths within 90 days of the person's death.[15]  By releasing detainees at the last minute, ICE avoids reporting their deaths to the public, investigating the circumstances of their deaths, and paying for their medical costs.[16]  This practice reinforces ICE's culture of secrecy and denies families and the public at large their rights to know what passes for medical care in ICE facilities.

---

[13] Adolfo Flores, *A Transgender Woman Died After Being Held For Weeks In ICE Custody*, BuzzFeed News, June 3, 2019, https://www.buzzfeednews.com/article/adolfoflores/transgender-woman-dies-ice-custody-asylum; Sam Levin, *Trans woman who died after illness in US custody had asked to be deported, family says*, The Guardian, June 12, 2019, https://www.theguardian.com/us-news/2019/jun/12/trans-woman-death-us-custody-ice-deportation.

[14] Amy Yurkanin, *No natural light, no health food, detained immigrants in the South face harsh conditions*, New Orleans Advocate, Nov. 24, 2016, https://www.nola.com/news/crime_police/article_1e6b877a-2528-53b7-b75b-ce155189c194.html; William Thornton, *'One who could have been you': Group protests former detainee's death*, Advance Local, Feb. 28, 2016 (updated Jan. 13, 2019), https://www.al.com/news/anniston-gadsden/2016/02/one_who_could_have_been_you_gr.html; Complaint from CIVIC to John Roth, Inspector General, DHS, et al. (Mar. 31, 2016), http://www.endisolation.org/blog/wp-content/uploads/2016/02/Complaint-Etowah-Medical__1.pdf.

[15] ICE, Directive: Notification and Reporting of Detainee Deaths, Oct. 1, 2012, https://www.ice.gov/doclib/dro/pdf/notification_and_reporting_of_detainee_deaths.pdf; Staff Report, The Trump Administration's Mistreatment of Detained Immigrants: Deaths and Deficient Medical Care by For-Profit Detention Contractors, Comm. on Oversight and Reform, U.S. House of Representatives, Sept. 2020, at 4 ("Staff Report").

[16] Catalina Villegas, *'ICE Does This to Avoid Liability': Families, Lawyer Question Releases of Detainees Near Death*, Spectrum News, May 16, 2021, https://spectrumnews1.com/ca/la-west/immigration/2021/05/16/families--advocates-question-ice-releases-of-detainees-near-death; *see* Dan Glaun, *How ICE Data Undercounts COVID-19 Victims*, *supra* note 7.

8.      ICE investigations into detainee deaths and the information ICE maintains on detainee health prior to death is critical to understand how ICE operates and to keep ICE accountable.  Prior investigations into detainee deaths—including investigations at the Adelanto Processing Center from where Mr. Bucio and Mr. Arellano were released prior to their deaths— revealed that guards "falsified records to hide apparent dereliction of duty" and committed "other failures that point to serious lack of care."[17]  A report published jointly by the ACLU and other immigrant rights groups analyzed records obtained through FOIA requests for deaths in immigration detention between December 2015 and April 2017 and found that "substandard medical care contributed or led to" a majority of the deaths reported during that time.  The report further found that the "healthcare and oversight failures" identified in the report "point to larger, systemic deficits in immigration detention facility health care" that must be addressed by Congress, ICE, and state and local governments.[18]

9.      Subsequent Congressional investigation by the U.S. House of Representatives Committee on Oversight and Reform ("the House Committee") into detainee deaths at ICE facilities corroborated the ACLU's report, finding that "private prison contractors have let known problems fester into a full-blown crisis" that became "far worse during the coronavirus pandemic."[19]  The House Committee also found that ICE failed to release investigative reports on detainee deaths in custody in violation of federal law.[20]

---

[17] Kendall Taggart et al., *More Than 40 Immigrants Have Died in ICE Custody In The Past Four Years. Here Are Thousands Of Records About What Happened*, *supra* note 6.

[18] Human Rights Watch et. al., Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention, at 1-2 (June 2018), available at https://www.hrw.org/report/2018/06/20/code-red/fatal-consequences-dangerously-substandard-medical-care-immigration.

[19] Hamed Aleaziz, *A Congressional Oversight Committee Found That ICE Detainees Died After Receiving Poor Medical Care*, BuzzFeed News, Sept. 24, 2020, https://www.buzzfeednews.com/article/hamedaleaziz/ice-detainees-medical-care-congressional-report; *see* Staff Report at 1.

[20] Staff Report, at 3.

10.     The public, detainees in ICE custody, and families of detainees who have been, are, or will be in ICE custody deserve to know the full extent of ICE's treatment of ill and dying detainees.

11.     In July 2021, the ACLU submitted FOIA requests to DHS, ICE, and DHS OIG, seeking records relating to Defendants' treatment of hospitalized detainees and detainees released from custody prior to their death.  Despite reports that Defendants' improper treatment of detainees continues to date, Defendants either denied or did not respond to the ACLU's request for expedited processing, and have not to date produced any records in response to the ACLU's FOIA request. As Defendants keep these invaluable records from the public view, detainees continue to face negative health consequences while in detention.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B). The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331, and authority to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.  The Court has personal jurisdiction over the parties.

13.     Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

## PARTIES

14.     Plaintiff American Civil Liberties Union is a nationwide non-profit, nonpartisan organization with over 1.7 million members dedicated to protecting the fundamental liberties and basic civil rights guaranteed by the state and federal Constitutions.  The ACLU is committed to ensuring that the United States government complies with the Constitution and the laws of this country in matters that affect civil liberties and human rights, including the rights of prisoners and

immigrants.  The ACLU is also committed to principles of transparency and accountability in government and seeks to ensure that the American public is informed about the conduct of its government in matters that affect civil liberties and human rights.  Obtaining information about governmental activity, analyzing that information, and widely publishing and disseminating it to the press and the public is a critical and substantial component of the ACLU's work and one of its primary activities.

15.     Defendant DHS is an agency of the U.S. government within the meaning of 5 U.S.C. § 551, 5 U.S.C. § 552(f), and 5 U.S.C. § 702.  DHS is headquartered in Washington, D.C., and has possession, custody, and control of the records that the ACLU seeks, including through its component office ICE.

16.     Defendant DHS OIG is a component of DHS and an agency of the U.S. government within the meaning of 5 U.S.C. § 551, 5 U.S.C. § 552(f), and 5 U.S.C. § 702.  DHS is headquartered in Washington, D.C., and has possession, custody, and control of the records that the ACLU seeks, including through its component office ICE.

17.     Defendant ICE is a component of DHS and an agency of the U.S. government within the meaning of 5 U.S.C. § 551, 5 U.S.C. § 552(f), and 5 U.S.C. § 702.  ICE is headquartered in Washington, D.C., and has possession, custody, and control of the records that the ACLU seeks.

**FACTS**

18.     On July 14, 2021, the ACLU submitted a FOIA request to DHS, DHS OIG, and ICE (Ex. A) seeking the following records:

> (1) Any and all documents, without limitation to date, including any communications, investigatory reports, and any and all exhibits, appendices, or attachments thereto, relating to the hospitalization, death, decision to release from custody, or release from custody of the following individuals.

| Name | Country of Origin | Approximate Date of Death | ICE Detention Facility Prior to Hospitalization and Death | Location at Death |
|------|-------------------|---------------------------|------------------------------------------------------------|-------------------|
| a. Teka Gulema | Ethiopia | January 18, 2016 | Etowah County Detention Center, Alabama | Riverview Medical Center, Gadsden, AL |
| b. Johana Medina Leon | El Salvador | May 23-June 1, 2019 | Otero County Processing Center, New Mexico | Del Sol Medical Center, El Paso, TX |
| c. Jose Ibarra Bucio | Mexico | March 21, 2019 | Adelanto ICE Processing Center, California | Loma Linda University Medical Center, Loma Linda, CA |
| d. Martin Vargas Arellano | Mexico | March 6, 2021 | Adelanto ICE Processing Center, California | St. Judge Medical Center, Fullerton, CA |

(2) Any and all DHS OIG reports of investigation that are identified in any of the records responsive to Request #1. This includes any and all exhibits, appendices, or attachments to the DHS OIG reports of investigation.

(3) Any and all ICE OPR reports of investigation that are identified in any of the records responsive to Request #1. This includes any and all exhibits, appendices, or attachments to the DHS OPR reports of investigation.

(4) Any and all documents and communications, including ICE and IHSC directives, policies, procedures, protocols, and trainings, regarding the release of detainees from custody who are hospitalized or transferred from detention for off-site medical care. This includes all versions of the documents that were in effect during the request period, as well as any updates, amendments, and attachments thereto.

(5) Any and all documents and communications, including databases, spreadsheets, lists, and other data compilations, that identify detainees who were hospitalized or transferred from detention for off-site medical care, the date of hospitalization, date of discharge from hospital (if any), date of return to detention (if any), date of release from custody (if any), detention facility, and/or medical condition/reason for hospitalization or offsite medical care.

(6) Any and all documents, communications, and other records, including spreadsheets, emails, significant incident reports (SIRs), significant event notification reports (SEN), investigatory reports, and associated documentation, regarding detainees who are hospitalized or transferred from detention for off-site medical care and subsequently released from ICE custody while hospitalized or while receiving off-site medical care.

(7) Any and all documents, communications, and other records, including emails, spreadsheets, significant incident reports (SIRs), significant event notification reports (SEN), investigatory reports, and associated documents, regarding the death of detainees who were hospitalized or transferred from detention for off-site medical care, were released from ICE custody, and subsequently died while hospitalized.

(8) Any and all documents, communications, and other records, including databases, spreadsheets, lists, and other data compilations, that identify detainees who were hospitalized or transferred from detention for off-site medical care due to COVID-19, and were subsequently released from custody while hospitalized, dates of hospitalization, detention facility, medical condition/reason for hospitalization or treatment, name and location of hospital, date of return to detention (if any), date of release from custody or issuance of order of recognizance (if any), and/or reason for release from custody.

(9) Any and all documents, communications, and other records, including ICE and IHSC directives, policies, procedures, protocols, and trainings, regarding the release of detainees from custody who are hospitalized or transferred from detention for off-site medical care, including on orders of recognizance, due to COVID-19 infection,

(10) Any and all documents, communications, and other records, including bills, invoices, charges, or payment, related to the hospitalization or off-site medical treatment of detainees who were hospitalized or transferred for off-site medical treatment and were subsequently released from custody while hospitalized.

19.     The July 14 request sought all responsive records "from January 1, 2019 to the present."

20.     The ACLU sought expedited processing of the July 14 request, citing the urgent need to inform the public about ICE's treatment of people in detention, ICE's decisions to release people from custody prior to death, and the ACLU's activities as an organization "primarily engaged in disseminating information" within the meaning of FOIA.

21.     On July 27, 2021, DHS's FOIA office acknowledged receipt of the FOIA request

and stated that the request had been given a tracking number, 2021-HQFO-01263.

22.     On August 2, 2021, DHS OIG acknowledged receipt of the FOIA request and stated that the request had been given a tracking number, 2021-IGFO-00200.  DHS OIG denied the ACLU's request for expedited processing, stating that the ACLU had "fail[ed] to establish a particular urgency to inform the public" about the information contained within the FOIA request. DHS OIG also wrote that it "ha[d] not yet made a decision on [the ACLU's] request for a fee waiver."

23.     On August 16, 2021, ICE acknowledged receipt of the FOIA request and stated that the request had been given a tracking number, 2021-ICFO-38388.  ICE determined that the ACLU was a "media requester" and would be charged in accordance with FOIA regulations as applied to media requesters.  ICE did not make a determination on the ACLU's request for expedited processing and further stated that it "may encounter some delay in processing your request."

24.     Also on August 16, 2021, the ACLU sent by FedEx an appeal of DHS OIG's denial of the ACLU's request for expedited processing.  DHS OIG has not yet adjudicated the appeal.

25.     On August 25, 2021, DHS acknowledged receipt of the FOIA request and stated it was "transferring this request to the FOIA Officers for [ICE] and [DHS OIG], for processing under FOIA and direct response to you."

26.     To date, each of DHS, DHS OIG, and ICE have not determined whether they will comply with the ACLU's request or produced a single document.  Each day, Defendants are further in breach of their requirement to respond to the ACLU's FOIA requests.  Immigrants detained in ICE facilities, their families, and the general public have an urgent need for this information.

**CLAIMS FOR RELIEF**

**CLAIM I**
**Violation of FOIA, 5 U.S.C. § 552**
**Wrongful Withholding of Non-Exempt Responsive Records**

27.     The ACLU properly requested records within the possession, custody, and control of Defendants.

28.     Defendants are agencies and components thereof subject to FOIA, and they must therefore release in response to a FOIA request any non-exempt records and provide a lawful reason for withholding any materials.

29.     Defendants are wrongfully withholding non-exempt agency records requested by the ACLU by failing to produce non-exempt records responsive to its FOIA requests.

30.     Defendants are wrongfully withholding non-exempt agency records requested by the ACLU by failing to segregate exempt information in otherwise non-exempt records responsive to the ACLU's FOIA requests.

31.     Defendants' failure to provide all non-exempt responsive records violates FOIA and applicable regulations.

32.     Because Defendants failed to comply with the applicable time-limit provisions of FOIA, the ACLU has constructively exhausted its administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C)(i).

33.     The ACLU is therefore entitled to declaratory and injunctive relief requiring Defendants to promptly produce all non-exempt records responsive to its FOIA requests and provide indexes justifying the withholding of any responsive records withheld under claim of exemption.

**CLAIM II**
**Violation of FOIA, 5 U.S.C. § 552**
**Failure to Conduct Adequate Searches for Responsive Records**

34.     The ACLU properly requested records within the possession, custody, and control of Defendants.

35.     Defendants are agencies subject to and within the meaning of FOIA, and they must therefore make reasonable efforts to search for requested records.

36.     Defendants have failed to promptly review agency records for the purpose of locating those records that are responsive to the ACLU's FOIA requests.

37.     Defendants' failure to conduct adequate searches for responsive records violates FOIA and applicable regulations.

38.      Because Defendants failed to comply with the applicable time-limit provisions of FOIA, the ACLU has constructively exhausted its administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C)(i).

39.     The ACLU is therefore entitled to injunctive and declaratory relief requiring Defendants to promptly make reasonable efforts to search for records responsive to the ACLU's FOIA requests.

**REQUEST FOR RELIEF**

WHEREFORE, the ACLU respectfully requests the Court to:

(a)     Declare unlawful the Defendants' failure to comply with FOIA;

(b)     Declare that Plaintiffs are entitled to disclosure of the requested records;

(c)     Order Defendants to immediately process the ACLU's request and to disclose, in their entirety, unredacted versions of all records responsive to the ACLU's request that are not specifically exempt from disclosure under FOIA, including any non-

identical copies of any such records;

(d)     Enjoin Defendants from charging the ACLU search, review, or duplication fees of

        the processing of the requests;

(e)     Enjoin Defendants from continuing to withhold any and all non-exempt records

        responsive to Plaintiffs' request;

(f)     Retain jurisdiction of this action to ensure that no agency records are wrongfully

        withheld;

(g)     Award Plaintiffs their reasonable attorney's fees and litigation costs incurred in this

        action, pursuant to 5 U.S.C. § 552(a)(4)(E); and

(h)     Grant such other relief as the Court may deem just and proper.

Dated:  October 7, 2021                    Respectfully submitted,

                                           /s/ Leslie C. Esbrook
                                           Leslie C. Esbrook (D.C. No. 1670737)
                                           ROBBINS, RUSSELL, ENGLERT, ORSECK
                                           & UNTEREINER LLP
                                           2000 K Street N.W., 4th Floor
                                           Washington, D.C. 20006
                                           (202) 775-4500
                                           lesbrook@robbinsrussell.com

                                           Eunice Cho*
                                           American Civil Liberties Union
                                           National Prison Project
                                           915 Fifteenth St. NW, 7th Floor
                                           Washington, DC 20005
                                           (202) 548-6616
                                           echo@aclu.org

                                           Arthur B. Spitzer (D.C. No. 235960)
                                           American Civil Liberties Union Foundation
                                              of the District of Columbia
                                           915 Fifteenth St. NW, 2nd Floor
                                           Washington, DC 20005
                                           (202) 601-4266
                                           aspitzer@acludc.org

                                           *Attorneys for Plaintiff*


                                           *application for admission *pro hac vice*
                                           forthcoming

15